DA 06-0195

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 427

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

LAURENCE DEAN JACKSON, JR.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
In and For the County of Blaine, Cause No. DC 03-08
Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robert M. Peterson; Peterson Law Office; Havre, Montana

          Jeffrey T. Renz; Clinical Professor of Law, University of Montana;
Missoula, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Jonathan M. Krauss,
Assistant Attorney General; Helena, Montana

          Don Ranstrum; Blaine County Attorney; Chinook, Montana

Submitted on Briefs:  May 20, 2009

Decided:  December 15, 2009

Filed:

_____
                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 On the night of May 29, 2003, a sheriff's deputy pursued Laurence Dean Jackson, Jr., on foot through a dark field near Harlem, Montana. A second deputy joined the pursuit and, after a struggle with Jackson, one deputy was left dead and the other wounded from gunshots. The State charged Jackson with deliberate homicide and attempted deliberate homicide of the deputies, and sought the death penalty for the deliberate homicide charge. In November of 2004, a Missoula County jury found Jackson guilty of both counts. The District Court sentenced Jackson to life imprisonment without parole on both counts, and one hundred years without parole as a persistent felony offender. Jackson appeals his convictions and presents the following issues:

¶2 1. Was there sufficient evidence to support Jackson's convictions of deliberate and attempted deliberate homicide?

¶3 2. Was Jackson's right to due process violated by the State's presentation of DNA evidence at trial?

¶4 3. Did the District Court err by denying Jackson's motion for a new trial based upon the State's alleged withholding of exculpatory information in violation of Jackson's right to due process?

¶5 4. Did the District Court abuse its discretion by authorizing the use of a non-visible leg restraint during trial?

¶6 5. Did the District Court abuse its discretion by denying Jackson's request to show a witness a scar on his abdomen at trial?

2

¶7   6.   Did the District Court abuse its discretion by permitting the State to offer expert testimony in rebuttal to matters raised by the Defense for the first time at trial?

## BACKGROUND

¶8   After dark on May 29, 2003, two Blaine County Sheriff's deputies, Deputy Joshua Rutherford and Deputy Loren Janis, entered a field in Harlem, Montana, in pursuit of Jackson. Within several minutes, both deputies had been shot. Deputy Rutherford died quickly from a gunshot wound to the chest, and Deputy Janis stumbled out of the field with a gunshot wound to his forearm and a shrapnel head wound. Due to an alleged alcoholic blackout, Jackson was unable to recount the events, leaving Janis as the sole witness testifying as to what occurred.

¶9   Earlier that day, Jackson began drinking alcohol and continued to drink into the evening hours, becoming increasingly aggressive. While riding in his cousin Cassandra Jackson's vehicle, Jackson demanded she return him to Harlem. When she would not, Jackson began kicking the back of the front passenger seat, and threw an unfinished beer at Cassandra's forehead, causing injury. Jackson also began fighting in the back seat with another passenger, William "Sprout" Gone. Jackson punched Gone, and bit his finger, nose, and ear, leaving blood, a fingernail and pieces of Gone's flesh in the back seat. Cassandra and another passenger pulled Jackson off of Gone and out of the car, leaving him shoeless on the side of the road. Jackson eventually made his way back to nearby Harlem, to the trailer home of his girlfriend, Mari Blackbird. When Blackbird returned home that night with her mother and children, she discovered Jackson inside. Drunk and bloodied, Jackson had trashed the trailer home and barred the door, refusing to

3

let Blackbird inside. Blackbird called the police, complaining that Jackson had ransacked her trailer and locked her out. When Jackson heard Blackbird calling the police, he ran out the back door and fled across a neighbor's yard. Jackson returned, however, and hid in nearby bushes.

¶10    When the Blaine County Sheriff's Office received Blackbird's call, Janis, the on-duty deputy, was in Chinook, a nearby town. Janis asked the dispatcher to notify Deputy Rutherford of the incident. Deputy Rutherford was off duty, but resided in Harlem and was closer to Blackbird. Janis then left Chinook, driving towards Harlem at a high rate of speed. Deputy Rutherford arrived at the scene first and Blackbird's mother pointed to the bushes and told him, "He's over there. He's hiding in the bushes . . . . It's Larry Jackson." Jackson started running, and Deputy Rutherford gave chase, pursuing Jackson on foot through an open field, across an irrigation ditch, across U.S. Highway 2, and into a grassy field on the southern side of the highway. Witnesses heard Deputy Rutherford issue various commands to Jackson, saying: "[S]top, don't do this, it's not worth it," "Get down. Please don't do this," "[P]lease stop, please don't do this," "[J]ust stay down, just stay down, don't make it harder on yourself, Larry," and "Stop. Get down. I'm a deputy."

¶11    Deputy Rutherford ultimately caught Jackson and the two struggled. During the tussle, Deputy Rutherford lost his Blaine County Sheriff's ball cap, and Jackson lost his bloody shirt. Jackson was also able to wrest Deputy Rutherford's flashlight from him. While Deputy Rutherford was struggling with Jackson, Deputy Janis arrived at Blackbird's residence. Blackbird's neighbors, Fred and Debbie Green, informed Janis

4

that Deputy Rutherford and Jackson had run past the irrigation ditch and across the highway. Janis proceeded in their direction on Highway 2 until he heard yelling and saw the beam of a flashlight in the dark field, which he assumed was Deputy Rutherford. It was not. Janis left his vehicle and proceeded into the field toward the light.

¶12 As Janis neared the fenced corner of a power substation located in the field, Deputy Rutherford emerged from the darkness, exhausted, winded, and breathing heavily. Janis was startled, and realized that Jackson had the deputy's flashlight and was approaching them. Jackson emerged from the dark, raised his arms and yelled, "well arrest me then"! As Jackson approached, Deputy Rutherford told Janis to spray Jackson with OC pepper spray, and Janis did so. The OC pepper spray did not appear to have its intended effect, as Jackson wiped the spray off his face, turned and started to walk away. Janis dropped the spray canister, and pulled out his asp, a steel club. He ordered Jackson to get down on the ground. Jackson didn't comply, and continued walking away. Janis struck Jackson with the asp, first in the thigh, and then in the knee, buckling Jackson to the ground. Both deputies then rushed Jackson. Deputy Rutherford was able to place an arm hold on Jackson on the ground, while Janis struck Jackson again in the shin, ordering him to comply. However, Deputy Rutherford soon lost his grip on the struggling Jackson, and Jackson bit Deputy Rutherford twice on the shoulder. Intending to further strike Jackson with his asp, Janis then heard gunshots he later described as "boom, ba-boom," and was thrown backwards. Deputy Rutherford cried out, "Loren, I've been shot, I've been shot by the heart." Janis realized he had been shot in his left arm, and felt a slight burn on his face.

5

¶13     Jackson retreated from the deputies and Janis saw that Jackson was holding Deputy Rutherford's gun as he walked away. Janis then heard more gunshots and saw muzzle flashes in the dark coming from the retreating Jackson. Janis backed up in an effort to draw Jackson's fire away from Deputy Rutherford and returned fire, discharging five rounds toward Jackson. Janis saw Jackson drop to the ground, and he believed he had hit Jackson. Janis headed to his patrol car to call for help, passing Jackson en route.

¶14     At the patrol car, Janis radioed dispatch for an ambulance and backup, exclaiming "officer down, officer hit." Blackbird's neighbors, the Greens, caught up to Janis, and Janis said to Green, "Oh, Christ, Fred, Josh is hit, he's down." Green and Janis then looked up to see Jackson emerging from the field. Jackson approached the car in an awkward manner, causing Janis to be fearful of an attack. Janis was able to reload his gun, and testified that he yelled at Jackson, "Get down on the ground . . . . You shot F-ing Josh and you shot F-ing me. Get down on the ground or I'm going to kill you." While giving commands, Janis mentally designated a line on the ground at which he determined to shoot and kill Jackson if he crossed it. Yelling that he didn't have a gun, Jackson flopped on the ground and took his pants off to show that he no longer had Deputy Rutherford's gun. Jackson shouted obscenities back to Janis, screaming "Go ahead and fucking shoot me. I don't care. I'm not going back to prison." Eventually backup arrived, and Jackson was taken into custody. Responding paramedics determined that Deputy Rutherford was dead at the scene. While being checked by the paramedics, Jackson responded that he was "okay," and that he had "brought this on myself."

6

¶15 The State charged Jackson with deliberate homicide of Deputy Rutherford and attempted deliberate homicide of Janis. The State gave notice of its intention to seek the death penalty for the deliberate homicide and to treat Jackson as a persistent felony offender. Jackson was represented by two attorneys, Havre attorney Robert Peterson and Helena attorney Edmund Sheehy. The District Court changed the venue for the trial to Missoula County. The parties engaged in extensive discovery, including DNA testing of more than forty samples of blood and other materials taken from the scene. Upon Jackson's petition, the District Court approved defense costs for DNA analysis and a DNA trial expert.

¶16 The jury trial began in Missoula District Court on October 12, 2004, and concluded over three weeks later, on November 5, 2004. The jury was presented with the testimony of 53 witnesses, including 16 expert witnesses, and approximately 240 items of physical evidence. At the close of the State's case, Jackson moved to dismiss the deliberate homicide charge, arguing insufficient evidence. The District Court denied Jackson's motion. The jury deliberated for approximately five and a half hours before returning a verdict convicting Jackson of both the deliberate homicide and attempted deliberate homicide charges. After additional argument and deliberation, the jury found that the State had proved the aggravating circumstance that Jackson deliberately killed Deputy Rutherford, a peace officer, while in the performance of his duty, pursuant to § 46-18-303(1)(b), MCA.

¶17 Following the verdicts, Jackson filed a motion for a new trial, claiming the jury could not have performed its duty because it rendered the verdict too quickly, the State

7

had not proved material elements of the crimes, and there was insufficient evidence to support the convictions. After a hearing, the District Court denied the motion, concluding that "any rational trier of fact could find beyond a reasonable doubt the essential elements necessary to support each verdict given" and that the interests of justice "do not require [a] new trial or modification of the verdicts." Jackson then sought a writ of supervisory control from this Court, asking us to declare unconstitutional § 46-18-301(2), MCA, requiring a sentencing hearing in a capital case be held within 180 days of the verdict. We denied Jackson's writ. *Jackson v. Seventeenth Jud. Dist.*, 327 Mont. 534, 115 P.3d 219.

¶18 The District Court conducted bifurcated sentencing hearings on the capital deliberate homicide count and the non-capital attempted deliberate homicide count. A presentence investigation report was filed with the court, addressing both counts. The District Court conducted the capital sentencing hearing from November 28 through December 7, 2005. After weighing the single statutory aggravating factor of deliberate homicide of a peace officer acting in the performance of duty, against the weight of the non-statutory mitigating factors, including Jackson's character and background, criminal history, the facts and circumstances of the offense, and the impact upon others, the District Court sentenced Jackson to life imprisonment without parole for the deliberate homicide of Deputy Rutherford. The District Court sentenced Jackson to two additional life sentences for the attempted deliberate homicide of Deputy Janis and for being a persistent felony offender, and ordered all three sentences to run consecutively.

8

¶19     On March 7, 2006, Jackson filed another motion for a new trial, claiming the State had withheld exculpatory information. Jackson claimed the State had failed to produce statements Janis made during counseling sessions that he had started to believe he was responsible for Deputy Rutherford's death. The District Court conducted an evidentiary hearing on Jackson's motion on March 23, 2006, and subsequently denied the motion. The District Court reasoned that Jackson failed to show any of the elements required to establish a violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

¶20     Jackson appeals. Additional facts will be discussed as necessary herein.

## ANALYSIS

¶21     ***1. Was there sufficient evidence to support Jackson's convictions of deliberate and attempted deliberate homicide?***

¶22     At the close of the State's case, Jackson moved to dismiss the deliberate homicide charge, asserting that the State had failed to present sufficient evidence by which the jury could find that Jackson had caused the death of Deputy Rutherford. The District Court denied the motion, and the jury subsequently found Jackson guilty of both the deliberate homicide of Deputy Rutherford and the attempted deliberate homicide of Deputy Janis. Following the trial, Jackson moved for a new trial on both convictions, on the ground that the evidence was insufficient to support either charge. The District Court again denied the motion.

¶23     We review de novo the District Court's denial of a motion for new trial on the basis of sufficiency of the evidence to support the verdict. *State v. Trujillo*, 2008 MT 101, ¶ 8, 342 Mont. 319, 180 P.3d 1153 (citing *State v. Swann*, 2007 MT 126, ¶ 19, 337

Mont. 326, 160 P.3d 511); *State v. Tuomala*, 2008 MT 330, ¶ 13, 346 Mont. 167, 194 P.3d 82 (citing *State v. Rosling*, 2008 MT 62, ¶ 33, 342 Mont. 1, 180 P.3d 1102). We view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *State v. Duncan*, 2008 MT 148, ¶ 42, 343 Mont. 220, 183 P.3d 111 (citations omitted); *State v. Johnson*, 1998 MT 289, ¶ 41, 291 Mont. 501, 969 P.2d 925 (citations omitted); *Tuomala*, ¶ 13 (citing § 46-16-403, MCA; *Rosling*, ¶ 35). We will not substitute our judgment for that of the jury, and will assume every fact which the jury could have deduced from the evidence. *State v. Merseal*, 167 Mont. 412, 415, 538 P.2d 1366, 1367 (1975); *State v. Azure*, 2002 MT 22, ¶ 49, 308 Mont. 201, 41 P.3d 899 (citations omitted). It is the sole province of the jury, as the finder of fact, to "weigh the evidence presented and determine the credibility of the witness[es]; in the event of conflicting evidence on factual issues, the trier of fact determines which will prevail." *Johnson*, ¶ 41 (quoting *State v. Sattler*, 1998 MT 57, ¶ 55, 288 Mont. 79, 956 P.2d 54). We will review the jury's verdict only to determine whether sufficient evidence supports it, not whether the evidence supports a different conclusion or verdict. *Johnson*, ¶ 41 (citing *Sattler*, ¶ 60).

¶24 For deliberate homicide, the State was required to prove that Jackson purposely or knowingly caused the death of Deputy Rutherford, a human being. Section 45-5-102(1)(a), MCA. As for the attempted deliberate homicide charge regarding Deputy Janis, the State was required to prove that Jackson, with the purpose to commit deliberate

homicide, committed any act constituting a material step toward the commission of deliberate homicide. Section 45-4-103(1), MCA.

¶25 Jackson contends that the State did not present sufficient evidence to convict him of either charge, contending that the State's case was based entirely on insufficient circumstantial evidence. Jackson argues that the State's sole eyewitness, Deputy Janis, admitted that he did not see Jackson fire the gun at the time of the fatal shot, nor did he see how he was shot. Jackson further argues that the physical evidence contradicts Janis's account of the events, and fits the defense theory that the deputies fired the shots.

¶26 Jackson offers various points to substantiate his argument: (1) if Jackson shot Deputy Rutherford as Janis described, at close range during their struggle, Deputy Rutherford would have had powder burns on his clothes or body, but there were none; (2) it would have been impossible for Jackson to fire the initial two shots nearly simultaneously, as Janis described; (3) Janis's testimony that Jackson and Deputy Rutherford were on the ground in front of him to the right as they struggled is inconsistent with Jackson's expert's testimony that the bullet entered Janis's arm from his left side; (4) Janis described a chain of events that could not have been accomplished in three minutes and fifty seconds, the time between the two radio dispatches by Janis; (5) Deputy Rutherford must have fired his own weapon, given that Deputy Rutherford was positive for gunshot residue while Jackson was negative; (6) because Deputy Rutherford's flashlight had smears of Jackson's blood, Jackson could not have fired Rutherford's revolver without also leaving his blood on the grip; and (7) although Janis claimed he sprayed Jackson with OC pepper spray and hit him with his asp, Jackson did

11

not have any bruising on his body nor was he deterred by the pepper spray. Jackson therefore argues that the State did not present sufficient evidence to establish the charges and that the jury adopted an "inherently impossible" interpretation of the evidence.

¶27 The State responds that sufficient evidence was indeed presented to prove the charges and that it is Jackson's suppositions which are impossible, because Janis could not have carried his flashlight in one hand, his asp in the other, and still have fired the initial shots which struck the deputy. The parties agree that the gun would have been at least thirty inches away from Deputy Rutherford for him to have been hit in the chest without sustaining powder burns. Thus, according to the State, "it would have been much more difficult for Deputy Rutherford to shoot himself in the chest with the muzzle of his gun at least 30 inches away, than it would have been for Jackson to achieve that separation and shoot."

¶28 Jackson is correct that the case against him included substantial circumstantial evidence. However, direct evidence is not required in order to prove the elements of a crime beyond a reasonable doubt. We have repeatedly held a criminal conviction may be based entirely on circumstantial evidence. *State v. Vukasin*, 2003 MT 230, ¶ 20, 317 Mont. 204, 75 P.3d 1284 (citing *State v. Hall*, 1999 MT 297, ¶ 22, 297 Mont. 111, 991 P.2d 929); *Tuomala*, ¶ 20 (citing *Rosling*, ¶ 36); *Johnson*, ¶ 43 (citing *State v. Lancione*, 1998 MT 84, ¶ 37, 288 Mont. 228, 956 P.2d 1358; *State v. Buckingham*, 240 Mont. 252, 260, 783 P.2d 1331, 1337 (1989)). "Circumstantial evidence must only be of such a 'quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt,' and all the facts and circumstances must be considered collectively." *Johnson*,

¶ 43 (quoting *Lancione*, ¶ 37). The jury "may infer the requisite mental state from what a 'defendant does and says and from all the facts and circumstances involved.'" *State v. Sage*, 221 Mont. 192, 199, 717 P.2d 1096, 1100 (1986) (citations omitted); § 45-2-103(3), MCA.

¶29 Further, the State's case did not rest entirely on circumstantial evidence. Deputy Janis's eyewitness account was, of course, direct evidence. Although Jackson attempts to minimize Janis's testimony because Janis testified he did not see the gun in Jackson's hand at the time of the first shots, there was much he did see. Janis testified that he saw Jackson holding the gun immediately following the first two shots, including the one that struck him, when he saw Jackson walking away. Janis testified that Deputy Rutherford immediately said, "Loren, I've been shot, I've been shot by the heart." Janis testified that Jackson began firing in his direction with Deputy Rutherford's gun and that he saw the muzzle flashes, and that he drew his gun and returned fire toward Jackson. Janis testified that he did not shoot himself or Deputy Rutherford, and that he did not believe Deputy Rutherford accidentally shot himself or Janis, but that it was Jackson who had done so while they were trying to apprehend him.

¶30 Jackson construes the State's case as resting entirely on Deputy Janis's testimony. Citing to *Merseal*, 167 Mont. 412, 538 P.2d 1366, Jackson contends this testimony alone was insufficient to convict him. Jackson argues that *Merseal* applies because Janis "admitted he never saw how he was wounded or how Rutherford was actually shot." However, Jackson misapplies our holding in *Merseal*.

13

¶31 In *Merseal*, a jury convicted the defendant of attempted assault for allegedly lunging for a weapon in his vehicle and causing reasonable apprehension or fear in the defendant's passenger, a law enforcement officer. At trial, the State failed to present any evidence that the defendant's conduct placed the officer in reasonable apprehension or fear, a required statutory element of proof. The jury could only have inferred the officer's apprehension from circumstantial testimony, and the testimony did not support such an inference. The officer testified that he thought the defendant had a gun, but he never saw one and his actions indicated that he was not concerned about the presence of a gun. *Merseal*, 167 Mont. at 413-17, 538 P.2d at 1367-68. We held that the record was devoid of "substantial credible evidence upon which a proper inference as to the officer's state of mind might have been drawn. The facts [were] of such a conjectural nature as to be insufficient to support the conviction." *Merseal*, 167 Mont. at 417, 538 P.2d at 1368. We did not, as Jackson suggests, conclude that an officer's testimony about the circumstances could not sustain a conviction. Rather, we determined that the officer's testimony as given did not provide evidence of fear or apprehension. The officer never testified that he was afraid, nor did his actions allow a reasonable inference that he feared the defendant was going to hurt him. *Merseal*, 167 Mont. at 413-17, 538 P.2d at 1367-68.

¶32 Unlike the proof offered in *Merseal*, the State presented substantial circumstantial evidence in addition to Janis's testimony from which the jury could have concluded that Jackson wrested the gun from Deputy Rutherford and discharged the firearm, killing Deputy Rutherford and wounding Janis. To conclude that the State's case relied solely

14

on Janis's testimony, as Jackson argues, would be to ignore the testimony from 53 witnesses, as well as some 240 items of physical evidence.

¶33 A rational trier of fact could have found that the circumstantial evidence was consistent with Janis's description of the events in the field that night. Several witnesses testified that only three men were in the field at the time of the shooting, the two deputies and Jackson. Numerous witnesses testified about hearing the gunshots at different intervals. It was dark, and the events transpired quickly, consistent with the timing of Janis's radio transmissions. Physical evidence corroborated Janis's account that Deputy Rutherford and Jackson engaged in a physical confrontation: Deputy Rutherford had bite marks from Jackson on his body; Jackson lost his shirt; Deputy Rutherford lost his hat; there was a mixture of blood from both Jackson and Deputy Rutherford in the area where the close contact confrontation occurred; further, Jackson gained control of Deputy Rutherford's flashlight. The State's crime scene reconstruction corroborated Janis's testimony of the directions he and Jackson took when they exchanged gunfire. While Jackson did not test positive for gun shot residue, the State presented evidence that the blood and sweat on Jackson's hands prevented the proper administration of the gun residue test. The State presented expert testimony that Deputy Rutherford could not have obtained the necessary distance to shoot himself without leaving gun powder residue on his shirt.

¶34 We conclude that the jury's verdict was not "inherently impossible" and that there was sufficient evidence presented, when viewed in a light most favorable to the prosecution, for a rational jury to find all of the essential elements of both the deliberate

15

homicide charge and the attempted deliberate homicide charge beyond a reasonable doubt.

¶35 *2. Was Jackson's right to due process violated by the State's presentation of DNA evidence at trial?*

¶36 In her opening statement, the prosecutor claimed a DNA expert would testify "that DNA analysis from a swab taken from Deputy Rutherford's service weapon cannot exclude the defendant, Laurence Dean Jackson, as a contributor." Stacey Brown, the State's DNA expert, testified that she analyzed forty-three items for DNA analysis, comparing each item to DNA samples taken from the four known participants: Deputy Rutherford, Janis, Jackson, and Gone (the passenger Jackson had bitten earlier on the night of the shooting). Regarding item 051A, a blood sample taken from the side of the trigger area of Deputy Rutherford's service revolver, Brown told the jury:

> It was a mixture of DNA from more than one individual. I could not eliminate Larry Jackson as being a contributor to the genetic material detected on that item, and I could not draw any conclusions as to Loren Janis's and/or Joshua Rutherford's contribution to the genetic material detected on that item, however, I was able to eliminate William Gone as being a contributor to that mixture.

The prosecutor later asked Brown, "[a]nd just for clarification, 051A that you took from around the trigger area, the defendant, Larry Jackson, cannot be eliminated as the contributor of that DNA?" Brown responded, "[t]hat is correct." However, in closing, the prosecutor argued to the jury, "[w]e also have the defendant's DNA from which the defendant cannot be eliminated on the trigger guard area on the side of the trigger of Deputy Rutherford's firearm. There is no reason that his DNA should be on that firearm, none whatsoever."

16

¶37 Jackson claims the manner in which the State presented the DNA evidence related to item 051A violated his right to due process. He argues the State committed the "Prosecutor's Fallacy," a term used to describe a prosecutor's act of confusing "source probability" with "random match probability."[1] In other words, Jackson contends the State gave the jury the false impression that there were only three potential DNA contributors—Jackson, Janis, and Deputy Rutherford—to sample 051A, the DNA on the trigger guard of Deputy Rutherford's gun. Jackson argues the State should have provided a "likelihood ratio" or "a random match probability that the results observed could be found in X% (or 1:Y) of the population and that Jackson was a member of that portion of the population." Jackson directs our attention to a litany of scientific material and decisions from other jurisdictions suggesting that a statistical statement about population frequency, such as "the chances that a person chosen at random from the population would match the DNA profile of the unknown sample," is a condition of admissibility of

---

[1] In *Brown v. Farwell*, 525 F.3d 787, 795 (9th Cir. 2008), the Ninth Circuit provided the following explanation of the "Prosecutor's Fallacy":

> The prosecutor's fallacy occurs when the prosecutor elicits testimony that confuses source probability with random match probability. Put another way, a prosecutor errs when he "presents statistical evidence to suggest that the [DNA] evidence indicates the likelihood of the defendant's guilt rather than the odds of the evidence having been found in a randomly selected sample." *U.S. v. Shonubi*, 895 F. Supp. 460, 516 (E.D.N.Y. 1995) (internal quotation marks and citation omitted), *vacated on other grounds*, 103 F.3d 1085 (2d Cir. 1997); *see also U.S. v. Chischilly*, 30 F.3d 1144, 1157 (9th Cir. 1994) ("To illustrate, suppose the . . . evidence establishes that there is a one in 10,000 chance of a random match. The jury might equate this likelihood with source probability by believing that there is a one in 10,000 chance that the evidentiary sample did not come from the defendant. This equation of random match probability with source probability is known as the prosecutor's fallacy."); Richard Lempert, *Some Caveats Concerning DNA as Criminal Identification Evidence*, 13 Cardozo L. Rev. 303, 305-06 (1991).

DNA evidence. Because the State failed to provide such context to the DNA results, Jackson contends the jury could not have properly understood the DNA evidence and the court should have excluded the evidence. According to Jackson, the State's presentation of DNA evidence denied him a presumption of innocence and improperly shifted the burden of proof to him, thereby violating his right to due process.

¶38 The State responds that we should decline review because Jackson waived the issue by failing to object to the evidence, and in fact acquiesced in the admission and use of the DNA evidence on numerous occasions during the trial. In his opening statement, defense counsel told the jury that the State's DNA expert, Stacey Brown, "could not eliminate Mr. Jackson, and all of the results were inconclusive as to whether it was Josh Rutherfords or Mr. Janis's, and, as a result, she couldn't put anyone in and she couldn't put anyone out." Jackson later called his own DNA expert, Kay Sweeney, who, rather than contradict Brown, clarified that he understood Brown's characterization of the DNA analysis from sample 051A to be that the DNA "could have come from Jackson . . . . That Mr. Jackson could not be eliminated." When asked whether Brown's DNA analysis meant that Jackson's blood was definitely in the mixture on Deputy Rutherford's gun, Sweeney stated, "[a]bsolutely not." Sweeney agreed, in front of the jury, that "there was not any ability on the part of Ms. Brown to include or exclude Mr. Jackson, Mr. Rutherford and Mr. Janis from that smear[.]"

¶39 In closing argument, Jackson reiterated Brown's testimony to the jury:

> The area of blood that they want to talk about is here right by the guard, and Stacey Brown, when I asked her about that said, well, you can't really draw any conclusions about that, and then, you know, we later got into this

18

discussion about I'm confused, I mean, he can't be excluded, but Josh Rutherford and Janis can't be eliminated.  Doesn't that mean no conclusions?  No, just means that Larry Jackson can't be excluded . . . .

¶40  The State alternatively argues that, even if we were to review this issue, none of the prosecutor's comments or arguments violated Jackson's due process rights by shifting the burden of proof to the Defendant.  The State presented the DNA evidence through an expert, and Jackson called his own DNA expert to rebut or cast doubt upon the State's evidence.  The State argues that Jackson was permitted, and indeed took advantage of every opportunity, to attack the significance of the sample 051A evidence throughout trial, and thus, "it is not true that such evidence went to the jury uncontested by the defense or contributed to any fundamental unfairness at trial."

¶41  On direct appeal, a party may generally raise only those issues and claims properly preserved.  *State v. West*, 2008 MT 338, ¶ 16, 346 Mont. 244, 194 P.3d 683 (citing *Rosling*, ¶ 76; *State v. Spotted Blanket*, 1998 MT 59, ¶ 13, 288 Mont. 126, 955 P.2d 1347).  "To properly preserve an issue or claim for appeal, it is necessary that the issue or claim be timely raised in the first instance in the trial court."  *West*, ¶ 16 (citing § 46-20-104(2), MCA; *State v. Buck*, 2006 MT 81, ¶ 117, 331 Mont. 517, 134 P.3d 53; *State v. Paoni*, 2006 MT 26, ¶ 16, 331 Mont. 86, 128 P.3d 1040; *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38).  Thus, failure to timely object during trial constitutes a waiver of the objection.  Section 46-20-104(2), MCA; *State v. Vandersloot*, 2003 MT 179, ¶ 23, 316 Mont. 405, 73 P.3d 174.  Certain jurisdictional or constitutional errors are exempted from the waiver rule, under narrowly-defined circumstances enumerated at

§ 46-20-701(2), MCA. Jackson relies upon another exception to the waiver rule: this Court's inherent power of plain error review.

¶42 Under the plain error review doctrine, we have the "inherent duty to interpret the constitution and to protect individual rights set forth in the constitution," and may therefore discretionarily review "claimed errors that implicate a criminal defendant's fundamental constitutional rights," even if the defendant did not timely object in the trial court, and notwithstanding the applicability of the criteria set forth in § 46-20-701(2), MCA. *West*, ¶ 23 (quoting *State v. Finley*, 276 Mont. 126, 134-37, 915 P.2d 208, 213-15 (1996), *overruled in part on other grounds*, *State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817). We invoke the plain error doctrine "sparingly," only where failure to review the claimed error "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *West*, ¶ 23 (quoting *Finley*, 276 Mont. at 137-38, 915 P.2d at 215; citing *State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, 77 P.3d 224; *Rosling*, ¶ 77).

¶43 Jackson concedes he did not object at trial to the State's use of DNA evidence, but argues first that his failure to object should be excused because the District Court denied his request for funds to analyze the DNA, particularly sample 051A. Jackson contends that, when he "asked for a DNA expert, the trial court approved the request but allocated only $1,500.00, an insufficient amount." Jackson's characterization of the record is simply incorrect. The District Court approved substantial defense costs for Jackson's trial, including DNA testing and forensic analysis. The District Court granted every

20

request Jackson made regarding his forensic expert Kay Sweeney, approving approximately $21,100.00 in expert fees.[2] The District Court moreover granted Jackson's request for $8,065.00 for additional DNA testing by Forensic Analytical labs. Finally, at Jackson's request, the District Court approved an additional $1,500.00 for re-testing of five blood samples the State had tested one month prior to trial. Jackson had filed a motion in limine to exclude the five samples at trial, given the late testing, or alternatively sought additional funds to perform his own testing on these samples. The District Court permitted the State to use the five samples at trial after the State demonstrated it acted with due diligence, and granted Jackson's request for more funds. Importantly, Jackson's request for the additional funds to perform the additional DNA testing was not related to sample 051A, which he challenges on appeal. Jackson has not challenged the District Court's ruling on the motion in limine, or the admission of the DNA evidence from those five samples. Accordingly, Jackson's argument is entirely without merit.

¶44 Jackson then urges this Court to find that "[t]he use of the Prosecutor's Fallacy, when it is not objected to, is grounds for reversal on plain error review." In support, Jackson cites *U.S. v. Massey*, 594 F.2d 676 (8th Cir. 1979) and *Brown v. Farwell*, 525 F.3d 787 (9th Cir. 2008). According to Jackson, *Massey* and *Brown* stand for the proposition that the Prosecutor's Fallacy renders a trial fundamentally unfair as a matter of law, violating a defendant's right to due process and excusing a defendant's failure to

---

[2] For the fee approvals, see R. 27, 31, 92, 102, 129, 130 and 131.

object, and thus entitling him to plain error review. However, Jackson's broad reading of *Massey* and *Brown* is incorrect. Neither supports Jackson's position.

¶45 In *Massey*, a jury convicted the defendant of bank robbery, based largely on the analysis of hairs found on a ski mask used during the heist. The State provided an expert, who testified that a microscopic comparison of three of five hair samples found in the ski mask matched the defendant's hair. When pressed by the district court for a statistical probability regarding the similarity of one individual's hair to another, the expert cautioned that he could not provide a probability, but in his experience had only seen two different individuals whose hair he could not distinguish between. From that testimony, the prosecutor argued to the jury that the hair analysis alone was sufficient to convict the defendant, establishing accuracy and identification at "better than 99.44 percent." *Massey*, 594 F.2d at 679-81. On appeal, the Eighth Circuit determined that the statistical probability testimony lacked foundation, was speculative and confusing, and was not harmless in light of the weakness of the other circumstantial evidence. *Massey*, 594 F.2d at 680-81. Notably, the Eighth Circuit specifically limited *Massey* to its unique facts in the subsequent decision of *U.S. v. Kandiel*, 865 F.2d 967, 971 (8th Cir. 1989) ("*Massey*, however, must be limited to its facts.").

¶46 In *Brown*, the Ninth Circuit found that the State's expert "improperly conflated random match and source probability, an error that is especially profound given the weakness of the remaining evidence against [the defendant]." *Brown*, 525 F.3d at 796.[3]

---

[3] The United States Supreme Court has granted certiorari in *Brown*. *McDaniel v. Brown*, 129 S. Ct. 1038 (Jan. 26, 2009).

At trial, the State's expert testified that the defendant's DNA matched the DNA found in the victim's underwear, and that 1 in 3,000,000 people randomly selected from the population would also match that DNA (random match probability). The expert then mischaracterized that probability, testifying that the evidence meant that there was a 99.99967 percent chance the DNA was from the defendant (source probability). The Ninth Circuit held that this unreliable testimony rendered the trial fundamentally unfair, thereby violating the defendant's right to due process. The State conceded that "[t]here was insufficient evidence to convict the Defendant unless the DNA evidence established his guilt." *Brown*, 525 F.3d at 796-97 (citations omitted).

¶47    Unlike *Massey* and *Brown*, the State's case against Jackson did not rest solely upon the DNA evidence. Further, the State did not provide the jury with any false probabilities, and thus did not plainly commit the classic "Prosecutor's Fallacy." It is true that the prosecutor briefly misspoke during her closing argument when stating "[w]e also have the defendant's DNA from which the defendant cannot be eliminated on the trigger guard area . . . . There is no reason that his DNA should be on that firearm, none whatsoever." This is partially correct, and contradictory. While it was correct that the defendant could not be eliminated as a contributor, it was not appropriate to refer to the sample as "the defendant's DNA." However, first, this statement is not the Prosecutor's Fallacy, which confuses random match probability with source probability. Second, this was a solitary incorrect reference within a trial in which both sides correctly explained the DNA evidence numerous times. The State's witnesses repeatedly explained that Jackson merely "could not be eliminated" as a contributor to the sample. The prosecutor

23

gave a full and correct explanation of the DNA evidence in her closing. Jackson repeatedly exploited the State's inability to positively identify him with DNA evidence. Jackson never objected to the DNA evidence, thoroughly cross-examined the State's expert, qualified the State's DNA evidence with his own expert, and argued to the jury that the State's expert did no probability calculations and could not draw any conclusions regarding the blood sample.

¶48 The State presented substantial evidence that Jackson fired the shots that killed Deputy Rutherford and wounded Deputy Janis, in addition to the DNA evidence. The DNA evidence was correctly explained numerous times throughout the trial. We cannot conclude that the brief, incorrect reference to the DNA evidence made by the prosecutor during closing, to which Jackson again did not object, had any effect on this trial and thus implicated Jackson's fundamental constitutional rights or compromised the integrity of the judicial process. Accordingly, we conclude that Jackson has failed to make the requisite threshold showing that plain error review of this claim is appropriate.

¶49 *3. Did the District Court err by denying Jackson's motion for a new trial based upon the State's alleged withholding of exculpatory information in violation of Jackson's right to due process?*

¶50 "Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice." Section 46-16-702(1), MCA. Generally, the grant or denial of a motion for a new trial is within the sound discretion of the district court. We review the district court's grant or denial of a new trial for an abuse of discretion; however, the district court's factual findings are reviewed for clear error. *State v. Clark*, 2005 MT 330, ¶¶ 18, 39, 330 Mont. 8, 125 P.3d 1099. Finally, this

24

Court's review of questions regarding constitutional law is plenary. *West*, ¶ 13 (citation omitted).

¶51    Jackson argues that the State committed a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, because the prosecution failed to disclose statements Janis made to a professional counselor after the homicide of Deputy Rutherford, wherein Janis made statements about being responsible for Deputy Rutherford's death. Jackson claims he did not know about these statements until a probation officer read Janis's victim impact letter at the sentencing hearing, which reads in relevant part:

> I want you to know you made several victims that night when you killed Josh and when you shot me . . . .
> Do you know, when Josh died several people blamed me for Josh? I started to believe this. After numerous hours of counseling, and my close friend John had informed me I was not to be blamed. He asked me why I was going through so much pain. I told him of the rumors and I wanted to believe them. John yelled at me and told me it was not my fault. But it is yours to blame Lawrence [sic]. Every person wants to look at someone to blame for Josh, when they need to take a good look at the person who killed him, and that is you.

Jackson took Janis's deposition before trial, and after he had begun counseling. In the deposition, Jackson's attorney asked Janis to whom he had spoken about the events of the night of the shooting. Janis revealed the names of several individuals, but did not initially identify his counselor. However, Janis identified his counselor, along with several others, when he completed the deposition correction sheet, which he gave to the prosecutor. The State sent the correction sheet to Jackson's attorneys. Jackson alleges a *Brady* violation for the prosecutor's failure to correct Janis during the deposition, and

25

upon one of his trial attorneys' inability to locate the correction sheet within his file during the trial. Jackson claims these failures violated his constitutional rights.

¶52     Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, the State must turn over any evidence that is material to a defendant's guilt or punishment. *State v. Field*, 2005 MT 181, ¶ 22, 328 Mont. 26, 116 P.3d 813; § 46-15-322(1)(e), MCA ("the prosecutor shall make available to the defendant for examination . . . all material or information that tends to mitigate or negate the defendant's guilt as to the offense charged or that would tend to reduce the defendant's potential sentence"). The prosecutor also has a continuing duty to promptly disclose any additional, discoverable evidence. Section 46-15-327, MCA. The State's failure to properly disclose exculpatory, material evidence to a defendant is a violation of the defendant's Fourteenth Amendment guarantee of due process, regardless of the prosecutor's good faith. *State v. Hatfield*, 269 Mont. 307, 311, 888 P.2d 899, 901-02 (1995) (citing *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97).

¶53     To establish a due process violation, the defendant must show: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *State v. Johnson*, 2005 MT 318, ¶ 12, 329 Mont. 497, 125 P.3d 1096 (citing *Gollehon v. State*, 1999 MT 210, ¶ 15, 296 Mont. 6, 986 P.2d 395).

¶54   In light of Janis's statement, Jackson filed a motion for a new trial on the ground that the State withheld the potentially exculpatory counseling admissions from him. The parties briefed the *Brady* issue, and the District Court held a hearing on Jackson's motion. After hearing argument and testimony from defense attorney Robert Peterson and prosecutor Yvonne Laird, the District Court issued a lengthy order denying the motion. The District Court found that the State had never been aware of the substance of the counseling sessions because the conversations were protected by the counselor-patient privilege. The court concluded that Jackson failed to prove that the nexus between the criminal investigation and the confidential mental health information was anything other than a patient dealing with typical reactions to exposure to violent trauma, and reasoned that the counseling sessions were not favorable to Jackson, nor would have changed the outcome of the trial. The State had provided both of Jackson's attorneys with the name of Janis's counselor in discovery, and Jackson's attorneys could have discovered the counseling evidence upon their own diligence. The District Court ultimately concluded that Jackson failed to show any of the elements for a *Brady* violation.

¶55   We do not find reversible error. Prior to trial, Janis and the State disclosed the name of the counselor, identifying her as a person with whom Janis had discussed the shooting. As the District Court found, the State disclosed the counselor in the deposition correction sheet on May 12, 2004, within two months of Janis's deposition and more than six months before the trial began. Jackson's contention that he did not receive the correction sheet was rejected by the District Court, which found that defense counsel Sheehy received the deposition correction sheet and that defense counsel Peterson was

27

merely unable to find the sheet in his files, noting "[f]ailure of defense counsel to maintain an orderly file or to appropriately communicate with each other does not excuse the lack of diligence." The jury also heard evidence through other witnesses that Janis felt guilty about the shooting incident. Sheriff Huestis testified that Janis told him "he wished he could have done more," which Huestis told the jury he understood to mean Janis "felt guilty that Josh was shot and killed." In sum, the record does not support Jackson's claim that the State withheld exculpatory evidence, and the District Court did not abuse its discretion in denying Jackson's motion.

¶56 **4. Did the District Court abuse its discretion by authorizing the use of a non-visible leg restraint during trial?**

¶57 We review the district court's decision to restrain a criminal defendant during trial for an abuse of discretion. *State v. Merrill*, 2008 MT 143, ¶ 10, 343 Mont. 130, 183 P.3d 56 (citing *State v. Herrick*, 2004 MT 323, ¶ 15, 324 Mont. 76, 101 P.3d 755). Prior to trial, the District Court held a conference with the parties to address, among other matters, the security measures in the courtroom during the trial. At the meeting, Jackson requested that any restraints be removed prior to his entry into the courtroom to prevent any possible prejudice from jurors seeing the defendant shackled. Jackson's counsel informed the District Court:

> [G]enerally, Missoula County, when they bring a defendant who is in custody in, they have him in leg irons and handcuffs, and in this type of case they will probably have him in belly chains. I mean, all of that, I believe, needs to be removed before they get Mr. Jackson off the elevator . . . because I do believe that creates prejudice for the defendant *if any juror happens to see that at any time.* [Emphasis added.]

¶58    The District Court agreed that security measures needed to be considered before trial, and asked the State to formulate a security plan. The court stated it would discuss the matter further after the State submitted the plan. In accord with the court's request, the State subsequently submitted the Draft Operations Plan, which concluded that Jackson was a high risk inmate due to the violent nature of his offense, as well as his age and size, and would therefore require physical restraints during transportation. The plan explained that any restraints would be removed prior to the jury entering the courtroom, but that Jackson would wear an "unobtrusive leg brace" during trial which would "hinder rapid movement but not be noticeable to the public." Jackson received a copy of the Draft Operations Plan, and did not object to the security measures or the leg brace. At trial, the District Court stated on the record that Jackson had appeared in street clothes and had "not [been] placed in any type of security device that is visible to members of the jury."

¶59    Jackson claims the District Court abused its discretion by permitting the use of the leg brace during the trial without first making a finding that his behavior warranted the brace. He further contends the leg brace hindered him from assisting in his defense, and violated his personal dignity. Jackson admits that, in the District Court, he only objected to the use of the handcuffs, leg irons and belly chains on the basis that the he would be unfairly prejudiced if the jury saw him, but argues he did not need to provide another objection to the use of an improper restraint.

¶60    To properly preserve an issue or claim for appellate review, the defendant must timely object and specify the grounds for error at trial. *West*, ¶ 16 (citing § 46-20-104(2),

29

MCA; *Buck*, ¶ 117; *Paoni*, ¶ 16; *In re T.E.*, ¶ 20). On appeal, the defendant must establish that he made an objection at trial on the same basis as the error asserted on appeal. *Vandersloot*, ¶ 23 (citing *State v. Davis*, 2000 MT 199, ¶ 38, 300 Mont. 458, 5 P.3d 547). "Requiring a defendant to specifically raise the objection at trial gives the prosecution and trial court an opportunity to avoid or correct the purported error." *Vandersloot*, ¶ 23 (citing *Davis*, ¶ 38). Failure to timely object during trial constitutes a waiver of the objection. Section 46-20-104(2), MCA; *Vandersloot*, ¶ 23.

¶61 When Jackson raised the issue about the security measures to be implemented at trial, his stated objection was that the jurors might be prejudiced against him if they saw him restrained by belly chains and shackles. The District Court appropriately addressed Jackson's concern by requesting the State formulate a security plan in advance of trial, and provide a copy to Jackson. The District Court held a pretrial status conference to review any concerns either party might have regarding the proposed security plan. Jackson did not object to the proposed use of the leg brace at the hearing, and Jackson has not demonstrated that he objected at any time prior to trial or during trial to any of the measures prescribed in the Draft Operations Plan. The District Court noted that the leg brace was not visible to the jury, and that Jackson was permitted to wear street clothes throughout the proceedings. Jackson requested permission to wear the same device during the sentencing phase of the proceeding.

¶62 "[I]t is a well-established maxim of law that 'acquiescence in error takes away the right of objecting to it.'" *State v. Malloy*, 2004 MT 377, ¶ 11, 325 Mont. 86, 103 P.3d 1064 (quoting § 1-3-207, MCA). We conclude Jackson's initial objection did not

30

preserve the different issue he now raises on appeal about the unobtrusive leg brace. Accordingly, we decline to review this issue.

¶63    *5.  **Did the District Court abuse its discretion by denying Jackson's request to show a witness a scar on his abdomen at trial?***

¶64    On the night of the incident, Jackson obtained a scar on the side of his abdomen. Dr. Cameron Parham, the emergency physician who examined Jackson after he was arrested, described the abdominal injury as being in the shape of the tip of a law enforcement baton.   At trial, after the State completed its direct examination of Dr. Parham, Jackson requested to show his scar to Dr. Parham in the presence of the jury. The State objected on safety and relevancy grounds, arguing that Jackson could have had Dr. Parham inspect the scar during the seventeen months prior to trial or that Jackson could have taken a picture of the scar for Dr. Parham's review at trial. The court concluded it was not going to allow the demonstration, explaining:

> I've considered the argument of counsel, I've weighed the statements under oath given by Dr. Parham, and, quite frankly, there is no procedure that has been outlined to the Court that would adequately address the security or safety concerns.  Further, the nature of the evidence that you intended to elicit by this demonstration, its relevance does not outweigh the security or safety concerns that are before the Court.  I am mindful of the fact that we are now 17 months later, and that this type of examination could have been done in a controlled environment.

Jackson argues the District Court abused its discretion in prohibiting the demonstration.

¶65    A district court has broad discretion to determine the relevance and admissibility of evidence.  *State v. Matz*, 2006 MT 348, ¶ 34, 335 Mont. 201, 150 P.3d 367 (citing *State v. Hicks*, 2006 MT 71, ¶ 19, 331 Mont. 471, 133 P.3d 206).  In determining whether to admit relevant evidence, the district court must determine whether the probative value

31

of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or is misleading the jury. M. R. Evid. 403. We will not overturn the district court's decision unless the court abused its discretion by acting arbitrarily without the employment of conscientious judgment, or exceeding the bounds of reason resulting in substantial injustice. *State v. Slade*, 2008 MT 341, ¶ 17, 346 Mont. 271, 194 P.3d 677 (citing *Matz*, ¶ 34).

¶66 Outside the presence of the jury and under the District Court's questioning, Dr. Parham testified that she could not look at Jackson's scar 17 months after the injury and testify as to its cause with any degree of precision. The District Court heard safety concerns from Sheriff McMeekin, that the demonstration suggested by Jackson could not be accomplished while ensuring the safety of everyone in the courtroom. The District Court also considered Jackson's criminal history and history of violence, referring to Jackson's federal, state, and tribal criminal convictions, as well as Jackson's propensity for biting. The District Court offered Jackson the opportunity to request an examination of his scar in a controlled environment, and move to present testimony as to the results to the jury. Jackson never did so. Under these circumstances, we conclude that the District Court did not abuse its discretion in denying Jackson's request.

¶67 ***6. Did the District Court abuse its discretion by permitting the State to offer expert testimony in rebuttal to matters raised by the Defense for the first time at trial?***

¶68 Determining the admissibility of rebuttal testimony is within the sound discretion of the district court, and we will not reverse the district court's ruling unless it abused this discretion. *State v. Hocevar*, 2000 MT 157, ¶ 76, 300 Mont. 167, 7 P.3d 329 (citing

*Massman v. City of Helena*, 237 Mont. 234, 243, 773 P.2d 1206, 1211 (1989)). Rebuttal evidence offered by the State is proper only if it tends to counteract a new matter offered by the defense, and has a tendency to contradict or disprove that evidence. *State v. Gardner*, 2003 MT 338, ¶ 36, 318 Mont. 436, 80 P.3d 1262 (citations omitted).

¶69 Prior to trial, Jackson provided the State with the report of his medical expert, Kay Sweeney, regarding the wounds on Janis's arm. After Sweeny testified, the prosecution called for its forensic medical examiner, Dr. Dale, to testify in rebuttal. Jackson objected, claiming the State did not provide him with notice that Dale would be testifying regarding the manner in which Janis's wounds were inflicted. The State responded that Dr. Dale was an appropriate rebuttal witness, given that they had listed him as a rebuttal witness prior to trial, and that they were not aware that Sweeny was going to testify that the bullet entered Janis's arm from the inside of his arm and exited on the outside of his arm, a position contrary to the unanimous testimony of the medical professionals who had treated Janis. Upon review of Sweeney's pre-trial report, the District Court concluded:

> I find that the testimony raises new matters, matters not otherwise contained or clearly stated in the report of Kay Sweeney. That report does not clearly state any position to be taken by that witness regarding the location of entrance or exit wounds sustained by Loren Janis . . . . [T]he state is entitled to offer rebuttal evidence, as the prosecution did not know or reasonably could not have expected to have known of such testimony until after this trial has begun.

¶70 Jackson argues the District Court's finding, that the State was unaware of the nature of Sweeney's testimony, was not correct because Sweeney's report included a conclusion that Janis's wound was self-inflicted. The State responds that Sweeney's

33

report did not indicate an opinion regarding where the bullet entered or exited Janis's arm, and thus it was unaware Sweeney would testify contrary to the other medical testimony. The State claims they asked Dale for an opinion after the trial began, when it became apparent that Sweeny was going to offer an opinion regarding the bullet's path through Janis's arm. Dale explained his opinion to the State, but provided no additional written report.

¶71 Upon request, the State must disclose "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case, together with the results of physical examinations, scientific tests, experiments, or comparisons." Section 46-15-322(1)(c), MCA. "The policy behind § 46-15-322, MCA, is to provide notice and prevent surprise." *State v. Stewart*, 2000 MT 379, ¶ 22, 303 Mont. 507, 16 P.3d 391 (citation omitted).

¶72 Section 46-15-322(1)(c), MCA, expressly requires disclosure of only written reports or statements. *See State ex rel. Carkulis v. Dist. Ct.*, 229 Mont. 265, 271, 746 P.2d 604, 608 (1987) ("We construe the word statements to include tapings, transcriptions, writings or other means used to memorialize the witness as to his observation or impression . . . ."). This qualification is confirmed by the preceding subsection, § 46-15-322(1)(b), which specifically requires disclosure of "all written or *oral statements* of the defendant" by the prosecution. (Emphasis added.) The disclosure statutes therefore only require the State to provide the defense with the written reports or statements of their experts. It would be impracticable, if not impossible, to require every statement by an expert to be provided to the defense, essentially requiring the recording

of every conversation between the State and its experts. Similarly, the State is not required to provide a summary of an expert's proposed testimony. *State v. Sol*, 282 Mont. 69, 78-79, 936 P.2d 307, 313 (1997); § 46-15-322(5), MCA.

¶73 The State disclosed Dr. Dale as an expert witness, and Jackson acknowledges he was on notice that Dr. Dale might be called in rebuttal. The State requested Dale's opinion regarding Janis's gunshot wound only after Jackson presented his expert's opinion about the bullet's path. Dr. Dale did not prepare a written report or statement. Although Jackson argues that the "issue with respect to Dr. Dale's rebuttal testimony has to do with the State's failure to disclose his report," there was no such report to disclose. Jackson has failed to establish a violation of § 46-15-322, MCA, or that Dale's testimony otherwise prejudiced him. Before Dr. Dale testified, two expert witnesses had provided the same opinion as Dale's regarding the entry and exit of the bullet which caused Deputy Janis's wounds. We conclude the District Court did not abuse its discretion in permitting Dr. Dale's rebuttal testimony.

¶74 Affirmed.

/S/ JIM RICE

We concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER

Justice James C. Nelson, specially concurring.

¶75 I concur in the Court's decision with the following caveat. As to Issue 1, I agree that Jackson waived the argument which he now makes on appeal for the first time.

35

Opinion, ¶¶ 41, 43. I also agree that we should not address his argument under plain error review. Opinion, ¶ 42. However, I do not agree with or concur in the Court's plain error review which follows in ¶¶ 43-47. It makes absolutely no sense that we decline to review error under the plain error doctrine in one breath and then proceed to address and resolve the merits of the claimed error in the next. In doing so, we actually do the plain error review that we say we are not going to do. Having declined plain error review, that should end the matter without further discussion of the merits of the claim of error at issue.

/S/ JAMES C. NELSON