Justice Jim Rice delivered the Opinion of the Court.
***202 ¶ 1 Michael Ilk appeals his conviction for Attempted Deliberate Homicide and Aggravated Assault after jury trial in the Nineteenth Judicial District Court, Lincoln County. We affirm, addressing the following issues:
1. Did the District Court err by instructing the jury using conduct-based definitions of purposely and knowingly and thereby prejudicing Ilk's substantial rights?
2. Did the District Court err by determining Ilk had not proven a Brady violation?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2 On April 15, 2015, Ilk shot Hadassah Pereslete and Tyler Wilson at a construction site near Eureka. The 40-year-old Ilk and 23-year-old Pereslete had been in a long-term relationship that Pereslete ended in January of 2015, after Ilk physically assaulted her. Following the break-up, Ilk continued to pursue Pereslete, and sent her a letter apologizing for the "domestic abuse" that also included a list of rules for Pereslete to follow once they were back together, including that she give him affection and text him at certain times each day. Pereslete and Ilk spent some time together in the following months, but on April 14, 2015, Pereslete called 911 for assistance when Ilk refused to leave her house.
¶ 3 The next day, Pereslete made plans to go out with Wilson, a childhood acquaintance with whom she had recently reconnected, via text messages between them. Apparently concerned they may encounter Ilk on their date, Pereslete asked Wilson to bring a firearm. That evening, Wilson picked Pereslete up from the construction site where she was working. At trial, differing accounts were presented of what then occurred.
¶ 4 Pereslete and Wilson testified that as they were leaving in Wilson's truck, Ilk drove up to the construction site at a high rate of speed and parked his truck in the driveway, blocking the exit. Ilk immediately began shooting a handgun at them, firing many shots in rapid succession. Attempting to flee, Wilson "floored it," driving his vehicle around Ilk's and over a lumber pile. Ilk continued firing, and hit both Pereslete and Wilson during the incident. Pereslete frantically called 911 and Wilson drove them toward the Eureka police station, four miles away, while both were bleeding from their wounds. Ilk pursued them.
¶ 5 Eureka Police Chief Ian Jeffcock had heard Pereslete's 911 call come in, responded to the area, and attempted to stop Ilk. Ilk ignored ***203 Jeffcock and continued driving after Wilson and Pereslete. Ilk testified he did not pull over because he was still scared for his life. At the station, Wilson jumped from the vehicle and ran for help, while Pereslete hid under the truck. Ilk pulled in next to Wilson's truck, but was immediately arrested. Despite their gunshot wounds, Wilson and Pereslete survived, though with lasting injuries.
¶ 6 Ilk claimed he acted with justifiable use of force, and testified that he had driven to the construction site to talk with Pereslete. He claimed that upon arriving at the job site, he parked his truck, and Wilson began shooting first while accelerating toward him. Ilk claimed he returned fire at Wilson and Pereslete in self-defense. Ilk further claimed he then drove to the police station to report the incident, unaware that he was pursuing Pereslete and Wilson.
¶ 7 Neither Ilk nor his vehicle had been struck by any bullets. Wilson was shot in the right hand and left arm, and his head had *1222 been grazed by either a bullet or piece of glass; Pereslete was shot in left arm and right leg; and Wilson's truck had been shot at least seven times, including two shots through the front windshield, two shots through the driver's side window, and two shots to the rear of the vehicle. When Officers searched Ilk's truck, they found a loaded 9 millimeter pistol on the floor, with a round chambered, an open box of 9 millimeter ammunition, and a cell phone. Wilson had several firearms in his truck, including two .45 caliber handguns, one in a gun sock in the center console, and the second found on the floor in the back of the cab. None of Wilson's firearms had a round chambered. Scattered throughout Wilson's truck, including the engine compartment, were several types of spent brass shell casings, including .45 caliber casings. Wilson explained that he had been recreational shooting earlier, during which time he fired from his truck, depositing the casings inside. Wilson testified that he did not handle any firearm during the altercation until they were on the road to the police station, at which time he placed one of his .45s upon the center console, which likely fell into the back of the truck's cab at some point prior to its recovery by police.
¶ 8 Montana Highway Patrol Trooper Neil Duram was the first to arrive at the construction site where the shooting occurred. Duram identified tire acceleration marks in the driveway, and vehicle tracks that ran off the driveway and over a pile of lumber. He located a pile of empty 9 millimeter shell casings, and a few feet away, one spent .45 casing. With night falling, he sketched the location of these items, and measured the distance from the acceleration marks to the .45 casing. However, he did not measure the distance between the various casings ***204 or the lumber pile. Detective Duane Rhodes of the Lincoln County Sheriff's Office, who specialized in sex crimes, took the lead in the investigation. By the time he arrived at the scene, it was dark, but Rhodes took photographs and collected the casings as evidence. He returned to the scene several weeks later and took daytime photos, which were turned over to the Defense. When the Defense offered these photos at trial, the State objected on the ground they did not accurately depict the scene given the time that had lapsed, but the District Court admitted the photos for demonstrative purposes.
¶ 9 During trial, Detective Rhodes testified that he had also visited the scene within a day or two after the shooting, and "believe[d]" he had taken additional photographs at that time. He noted that workers had already resumed construction on the house at this point and disturbed the scene. The Defense then moved to dismiss based on a Brady violation, as Rhodes' photographs, taken a day or two after the incident, had not been provided to the Defense. The Defense argued that the photos were exculpatory because the daylight photographs would more accurately depict the scene than the photographs taken several weeks later when the scene had changed significantly, due to it being an active construction site. Prosecutors responded they were unsure if the photographs existed, but if so, the photographs would have been available to the Defense through their open file policy. Prosecutors also noted the later photographs would not have depicted the location of the casings because they were bagged as evidence the night of the shooting, and the scene had changed as construction on the house had already resumed. The District Court denied the Brady motion, but stated the Defense could raise the issue later upon more sufficient information. The Defense did not raise the issue again, and the record is unclear on whether the Defense or the State attempted to locate the missing photographs, or if they exist.
¶ 10 While settling jury instructions, the State proposed the following mental state definitions: "A person acts knowingly when the person is aware of his or her conduct" and "A person acts purposely when it is the person's conscious object to engage in conduct of that nature." The Defense objected:
[The Defense]: The offenses Mr. Ilk faces are result oriented that should call for the result oriented definition of knowing and purpose.
[The Prosecution]: I disagree with [the Defense]. I think that the element of the offense of assaults, as well as if he is aware of a high probability or aware of his conduct that it is likely to cause death, or *1223 serious bodily injury, or bodily injury, knowingly is a ***205 pertinent mental state.
The District Court gave the conduct-based instructions of knowingly and purposely as the State had proposed in its written instructions.
¶ 11 During closing, the State argued that the evidence corroborated Pereslete and Wilson's account, noting that the windows in Wilson's truck were closed at the time of the shooting, that all bullet holes were going into Wilson's truck, and that Wilson's guns did not have a round chambered, suggesting Wilson did not fire from his truck. The State also noted that Ilk fired into the back of Wilson's pickup, inconsistent with a self-defense claim, and that, despite claiming to fear Wilson, Ilk pulled up next to Wilson's pickup at the police station. The State suggested the .45 casing found at the scene fell out of Wilson's truck when he ran over the lumber.
¶ 12 The Defense argued the evidence was consistent with Ilk's account, including the .45 casing found at the scene. The Defense attacked the thoroughness of the State's investigation, including the lack of precise measurements with regard to the location of the .45 casing found at the scene, the failure to conduct gunshot residue testing on Wilson, the failure to obtain and test bullets, and using a detective who was not experienced in shooting crimes. The Defense likewise attacked the State for not producing the more contemporaneous daytime photos of the scene, leaving the jury with only daytime photos taken weeks afterwards when the scene had changed substantially, in addition to the nighttime photographs.
¶ 13 The State had charged Ilk with two counts of Attempted Deliberate Homicide, two counts of Aggravated Assault and, alternatively to Aggravated Assault, two counts of Assault with a Weapon. The jury found Ilk guilty of two counts of Attempted Deliberate Homicide and two counts of Aggravated Assault.
¶ 14 Ilk appeals.
STANDARD OF REVIEW
¶ 15 "The standard of review of jury instructions in criminal cases is 'whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case.' " State v. Rothacher , 272 Mont. 303, 306, 901 P.2d 82, 84 (1995) (citations omitted). Our review of constitutional questions, including alleged Brady violations, is plenary. State v. Jackson , 2009 MT 427, ¶ 50, 354 Mont. 63, 221 P.3d 1213 (citations omitted). We review the district court's decision to grant or deny a new trial for abuse of discretion. Jackson , ¶ 50 (citations omitted).
***206 DISCUSSION
¶ 16 1. Did the District Court err by giving conduct-based definitions of purposely and knowingly and thereby prejudicing Ilk's substantial rights?
¶ 17 Ilk argues that the jury was given improper mental state instructions, because "conduct" instructions, rather than "result" instructions, were given. He argues this reduced the State's burden of proof and affected his substantial rights, requiring reversal.
¶ 18 The statutory definitions of knowingly and purposely contain both conduct-based and result-based versions. Section 45-2-101(35) and (65), MCA ; Mont. Crim. Pattern Jury Instr. 2-104 (2009) ("A person acts knowingly: when the person is aware of his or her conduct ... OR when the person is aware there exists the high probability that the person's conduct will cause a specific result...."); Mont. Crim. Pattern Jury Instr. 2-106 (2009) ("A person acts purposely when it is the person's conscious object: to engage in conduct of that nature OR to cause such a result."). Juries are to be instructed on the mental state pertinent to the crime charged. Rothacher , 272 Mont. at 310, 901 P.2d at 86-87 ; State v. Lambert , 280 Mont. 231, 236-37, 929 P.2d 846, 849-50 (1996) ; State v. Patton , 280 Mont. 278, 291, 930 P.2d 635, 642-43 (1996) ; State v. Azure , 2005 MT 328, ¶ 20, 329 Mont. 536, 125 P.3d 1116 ; State v. Nick , 2009 MT 174, ¶ 12, 350 Mont. 533, 208 P.3d 864 ; State v. Johnston , 2010 MT 152, ¶ 9, 357 Mont. 46, 237 P.3d 70; see also Mont. Crim. Pattern Jury Instr. 2-104 and -106 (2009) (cautionary instruction).
¶ 19 Both Attempted Deliberate Homicide and Aggravated Assault are result-based crimes that require a result-based mental *1224 state instruction. See §§ 45-4-103(1) and 45-5-102(1)(a), MCA (an element of Attempted Deliberate Homicide is that the person "does any act toward" causing the death of another human being, which is a result); § 45-5-202(1), MCA (an element of Aggravated Assault is that a person "causes serious bodily injury to another," which is a result); see also State v. Rosling , 2008 MT 62, ¶ 37, 342 Mont. 1, 180 P.3d 1102 (Deliberate Homicide is result-based); State v. Martin , 2001 MT 83, ¶ 16, 305 Mont. 123, 23 P.3d 216 (jury was instructed on Attempted Deliberate Homicide with result-based mental state); State v. Reim , 2014 MT 108, ¶ 46, 374 Mont. 487, 323 P.3d 880 (Aggravated Assault is result-based).
¶ 20 The State does not argue on appeal that the conduct-based instructions given to the jury were correct. Indeed, when responding to the Defense's objection, the prosecutor spoke in terms of a result-based ***207 definition. It is clear that the District Court improperly gave conduct-based mental state instructions, and should have given result-based definitions of knowingly and purposely.
¶ 21 However, a judgment will not be reversed for error that is harmless. Reversal requires the substantial rights of the defendant be affected. Rothacher , 272 Mont. at 310, 901 P.2d at 87 ; § 46-20-104, MCA. We have found reversible error when an improper mental state instruction affects the defendant's substantial rights. In Lambert , the defendant was charged with criminal endangerment after causing a collision while driving intoxicated. Lambert , 280 Mont. at 233, 929 P.2d at 847. He argued at trial that he did not act knowingly, because he was unaware of the result of his action. Lambert , 280 Mont. at 236, 929 P.2d at 849. The district court gave both conduct-based and result-based definitions of knowingly, which we found to be reversible error, explaining the effect was:
to alter the State's burden of proving beyond a reasonable doubt the elements of the offense: to prove that a defendant was aware of his conduct is one thing; to prove that he was aware of the high probability of the risks posed by his conduct is quite another.
Lambert , 280 Mont. at 237, 929 P.2d at 850. Likewise, in Johnston , the defendant was charged with obstructing a peace officer, for lying to the officer, and the district court gave the conduct-based instruction. Johnston , ¶¶ 9-10. We found it to ineffective assistance of counsel for the defense not to object to the conduct-based mental state instruction, because it lowered the State's burden, from the defendant intending to obstruct the officer, to merely the defendant knowingly lied to the officer. Johnston , ¶ 16.
¶ 22 We have also determined that an improper mental state instruction is harmless when the defendant's substantial rights are not affected. In Rothacher , we determined the District Court erroneously instructed the jury by not giving the result-based mental state instruction for Deliberate Homicide, but concluded the error was harmless:
The potential prejudice from Instruction No. 14 could occur where a defendant acted purposefully, but intended no harm. However, there were no facts presented in this case from which an argument could be made that when Rothacher struck his victim in the face and kicked him in the head while he was laying on the ground, he intended no harm. Therefore, Instruction No. 14 was, at worst, superfluous.
Rothacher , 272 Mont. at 310, 901 P.2d at 87. Likewise, in Patton , we held that it was error for the District Court to give a conduct-based ***208 mental state instruction for Deliberate Homicide, but found the error was harmless, noting:
The potential prejudice from Instruction No. 6 could occur where a defendant acted 'purposely,' but did not intend to cause any harm. However, in this case, as in Rothacher , no facts were presented from which a credible argument could be made that when [the victim] was stabbed eight times his assailant did not intend to cause any harm. Patton's only asserted defense was that the crime was committed by another person.
Patton , 280 Mont. at 291, 930 P.2d at 643.
¶ 23 Nick was a Deliberate Homicide case in which the Defendant relied on justifiable use of force. On appeal, Nick challenged as error the conduct-based mental state instruction given to the jury. Nick , ¶ 12. We determined the error was harmless, explaining *1225 that, "A defendant who relies upon the defense of justifiable use of force concedes that he acted purposely and knowingly." Nick , ¶ 13 (collecting cases). We reasoned that, "Having conceded as a matter of law that he acted purposely or knowingly, Nick's substantial rights could not have been affected by any error in the definition of those terms." Nick , ¶ 13.
¶ 24 Unlike Lambert and Johnston , Ilk's defense did not place a result-based mental state at issue, that is, he did not contend that he acted knowingly or purposely with regard to his conduct, but not with regard to the result of his conduct. This was consistent with the overwhelming evidence presented indicating that Ilk had acted to further the result of causing the death of another human being. Section 45-5-102(1)(a), MCA. Ilk's own testimony included admissions to both the conduct-shooting at Pereslete and Wilson-and the result of that conduct-that he knew shooting at Pereslete and Wilson was likely to result in their substantial injury or death. Rather, this case is similar to Rothacher and Patton , because there was no evidence that Ilk, while intending his conduct of shooting, did not intend any harm to result from that conduct. Indeed, it would be difficult to conceive of an intended act of pointing a loaded handgun at another person and repeatedly shooting without an intention for harm to result.
¶ 25 Neither were Ilk's substantial rights affected by the improper mental state instruction because of his reliance on the defense of justifiable use of force. As we held in Nick , a defendant who claims self-defense admits that he acted purposely and knowingly, albeit for an asserted justifiable reason. Ilk argues his case is distinguishable from Nick because a factual dispute existed as to whether Ilk was the aggressor or acting in self-defense and, therefore, the conduct-based ***209 definitions of purposely and knowingly were also incorrectly applied to the "aggressor" instruction given to the jury. That instruction provided:
The use of force in defense of a person is not available to a person who purposely or knowingly provokes the use of force against himself/herself unless such force is so great that he reasonably believes that he is in imminent danger of death or serious bodily harm and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or serious bodily harm to the assailant.
(Emphasis added.) However, the error in giving the conduct-based mental state instructions would have had, at best, a tangential effect on the jury's consideration, under this instruction, of whether Ilk purposely or knowingly provoked the use of force against himself. The distinction between the conduct and result-based instructions is simply too attenuated from the factual question of whether Ilk shot first and initiated the conflict for the erroneous instruction to have impacted Ilk's substantial rights. Ilk did not argue, and under the evidence could not reasonably argue, that he intended to shoot at Pereslete and Wilson but was either unaware of his actions or unaware of the high probability that shooting at others could provoke the use of force against him.
¶ 26 We conclude that, although the District Court erred by instructing the jury on the definitions of knowingly and purposely, the error was harmless, as Ilk's substantial rights were not affected and reversal is not required.
¶ 27 2. Did the District Court err by determining that Ilk had not proven a Brady violation?
¶ 28 Ilk argues the State's failure to provide the Defense with crime scene photos, referenced in Detective Rhodes' testimony and apparently taken within two days of the shooting, violated Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and requires reversal.
¶ 29 A failure by the State to disclose exculpatory evidence to a defendant is a violation of the defendant's Fourteenth Amendment guarantee of due process.[1] Jackson , ¶ 52 (citing Brady , 373 U.S. at 87, 83 S.Ct. 1194 ). To prove a due process violation *1226 under Brady , a defendant must show: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable ***210 probability exists that the outcome of the proceedings would have been different. State v. Reinert , 2018 MT 111, ¶ 17, 391 Mont. 263, 419 P.3d 662 (citations omitted). Prior to Reinert , Montana courts considered a fourth factor, that being whether the evidence could have been obtained by the defendant with reasonable diligence. Jackson , ¶ 53. We abandoned the diligence factor in Reinert , ¶ 17, n.1, explaining that the Ninth Circuit had held, in Amado v. Gonzalez , 758 F.3d 1119, 1136 (9th Cir. 2014), that the diligence factor was inconsistent with federal law and unsound public policy. See also Kathryn Brautigam, Brady Violations and the Due Diligence Rule in Montana , 78 Mont. L. Rev. 313, 333-37 (2017).
¶ 30 The defendant bears the burden of proving all three prongs to establish a Brady violation. See Reinert , ¶ 17. Here, both parties intermix their analysis of the three prongs, but we take them up independently. Ultimately, we conclude there was no Brady violation, because had the evidence been disclosed, there is not a reasonable probability the outcome would have been different.
1. Whether the State possessed evidence favorable to the defense.
¶ 31 Under the first prong, the defendant must show that "the State possessed evidence, including impeachment evidence, favorable to the defense." Reinert , ¶ 17. The defendant bears the burden of preserving issues for appeal, including the existence of potentially undisclosed Brady material. See State v. Arlington , 265 Mont. 127, 151, 875 P.2d 307, 321 (1994). The defense must make a showing of more than "mere speculation about materials in the government's files." United States v. Mincoff , 574 F.3d 1186, 1200 (9th Cir. 2009) (citations omitted); accord State v. Giddings , 2009 MT 61, ¶ 50, 349 Mont. 347, 208 P.3d 363. " 'Favorable' evidence includes evidence that has the 'potential to lead directly to admissible exculpatory evidence.' " State v. Stutzman , 2017 MT 169, ¶ 28, 388 Mont. 133, 398 P.3d 265 (citations omitted).
¶ 32 The State argues Ilk has not established the photographs existed, or if they did, that the Defense did not possess them, given Detective Rhodes' vague testimony that he "believe[d]" he took additional photographs a day or two later, and the State's response that if the photographs existed, they would have been turned over to the Defense. The State also argues Ilk has not proven the photographs would have been favorable to the defense. Ilk replies that it was the State's duty to disclose the photographs, and that the State did not do so, even after trial. He argues the photographs would have been favorable, because both the State and Defense relied on photographs of the scene to prove ***211 their respective theories about what occurred.
¶ 33 It is questionable whether the Defense proved that the photographs existed. Detective Rhodes' reference on cross-examination to the possibility he had taken the photos was vague at best. While the defendant is no longer required, for purposes of a Brady claim, to prove he could have obtained the evidence by reasonable diligence, he still bears the burden, as noted above, of preserving the issue for appeal and making a record of the existence of the potentially undisclosed Brady material. Here, the additional photographs were apparently never obtained by the Defense, and have not been made part of the record. Further, without the photos, it is difficult to assess whether they would have been favorable to the Defense. Nonetheless, crediting Rhodes' reference to additional photographs, and considering that the Defense first learned of the possible existence of the photos in the middle of the trial, we will here excuse Ilk's failure to make a sufficient record and assume for purposes of the analysis that the State possessed additional photos that were not provided to the Defense. Likewise, given the reliance on photos of the scene by the Defense during the trial, we will assume for the analysis that the photos could have been favorable.
2. Whether the prosecution suppressed the favorable evidence.
¶ 34 Under the second prong, a defendant must prove that "the prosecution *1227 suppressed the favorable evidence." Reinert , ¶ 17. Consistent with our abandonment of the diligence factor, the U.S. Supreme Court has described a prosecutor's duty to disclose evidence as an "affirmative duty," noting, "a defendant's failure to request favorable evidence [does] not leave the Government free of all obligation." Kyles v. Whitley , 514 U.S. 419, 432-33, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ; accord State v. Cooksey , 2012 MT 226, ¶ 73, 366 Mont. 346, 286 P.3d 1174 (Nelson, J., concurring in part and dissenting in part). Further, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady , 373 U.S. at 87, 83 S.Ct. 1194 ; accord State v. Fish , 2009 MT 47, ¶ 20, 349 Mont. 286, 289, 204 P.3d 681, 683. "[P]rosecutor[s] [have] a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles , 514 U.S. at 437, 115 S.Ct. 1555 ; accord Cooksey , ¶ 73 (Nelson, J., concurring in part and dissenting in part). Thus, the government's duty to provide Brady material is "ongoing." ***212 United States v. Blackley , 986 F.Supp. 600, 601 (D.D.C. 1997). Further, "if a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady ." Strickler v. Greene , 527 U.S. 263, 283, n.23, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
¶ 35 The State argues Ilk has not established the prosecutor suppressed this evidence, relying on the failure of Ilk to make an effort to obtain the evidence by, for instance, taking a recess to look at the photos on Detective Rhodes' computer.[2] Ilk responds that the State did not meet its continuing affirmative obligation, whether before, during, or after trial, to disclose the photographs to the Defense. Ilk argues he could not have sought the photos prior to trial because he was unaware they existed.
¶ 36 Ilk is correct. At trial, the prosecution responded to Ilk's Brady motion by relying on its open file policy, and thus had an obligation to ensure that all favorable evidence was contained in that file, including photographs taken and held by the police. Once the prosecution learned at trial that Detective Rhodes believed he had taken additional photographs, the prosecutor should have confirmed the existence of the photographs and provided them to the Defense. One criticism of the now-eliminated diligence factor is that prosecutors might avoid a Brady violation because the defense had not requested the undisclosed evidence, even if the defense was unaware the evidence existed, which is fundamentally unfair to defendants. See Brautigam, supra , at 335-37. This is the situation here. While the State is arguing there was no Brady violation because Ilk never asked for the photos, Ilk could not request what he did not know existed. Assuming they existed, we conclude the State suppressed the photos.
3. Whether a reasonable probability exists that the outcome would have been different had the evidence been properly disclosed.
¶ 37 Under the third prong, the defendant must show that "had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different." Reinert , ¶ 17. "A 'reasonable probability' of a different result is ... shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " Kyles , 514 U.S. at 434, 115 S.Ct. 1555 (citations omitted); accord Reinert , ¶ 17. Stated differently, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a ***213 different light as to undermine confidence in the verdict."[3] Kyles , 514 U.S. at 435, 115 S.Ct. 1555 ; accord State v. Weisbarth , 2016 MT 214, ¶ 26, 384 Mont. 424, 378 P.3d 1195.
¶ 38 Ilk argues that the absent photos undermine the confidence in the verdict because *1228 much of his defense relied on photos of the scene to corroborate his account of what happened. He notes the daytime photos possessed by the Defense were taken weeks later and did not depict the scene the same way that photos taken a day or two later would have.
¶ 39 However, we conclude there was not a reasonable probability of a different result had the photos been provided. Even though taken at night, photographs of the scene existed that depicted the shell casings and lumber, the positioning of which was important to the Defense. These were in addition to the daytime photos of the scene taken several weeks later. The jury would have been able to consider the nighttime photos, depicting location of the evidence, with the daytime photos taken later, to understand the scene at the time of the shooting. Although it is not known specifically what the undisclosed photos depicted, we know that by the time they were taken, the casings had already been collected and the scene had been altered to some degree by construction activity. Thus, the photos would not have put the "whole case in a different light" such that it would "undermine confidence in the verdict." Kyles , 514 U.S. at 435, 115 S.Ct. 1555. Further, the "record provides strong support" for the conclusion that the jury reached, see Strickler , 527 U.S. at 294, 119 S.Ct. 1936, including the accounts of two surviving victims, their wounds, and the photographic evidence of the truck in which they were riding, with windows rolled up, littered with bullet holes. While the Defense offered photographs and diagrams to corroborate Ilk's account, it also heavily attacked the State's investigation as inadequate, and used the missing photographs as a factor in that defense. In consideration of this record, we conclude Ilk has not demonstrated a reasonable probability that the outcome would have been different had the photographs been properly disclosed.
¶ 40 Affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
INGRID GUSTAFSON, J.
DIRK M. SANDEFUR, J.

Montana also has statutory requirements for disclosure by the prosecution, see , e.g. , § 46-15-322, MCA, but Ilk raises only a constitutional issue on appeal.

The State's brief was submitted before our decision in Reinert .

The undisclosed photos would have showed the crime scene in a literal "different light," because they were taken in the daytime, instead of at night, when the first photos were taken. However, the standard contemplates a broader assessment of the impact of the additional evidence upon the entire case.