FILED

06/30/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0612

DA 17-0612

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 170

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NEVADA B. ST. MARKS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 16-121
Honorable Daniel A. Boucher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Koan Mercer, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

          Karen Alley, Hill County Attorney, Havre, Montana

Submitted on Briefs:  April 8, 2020

Decided:  June 30, 2020

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Nevada B. St. Marks appeals his conviction of attempted deliberate homicide by a jury in the Twelfth Judicial District Court, Hill County.  We affirm, and restate the issues as follows:

1. *Does the District Court's "specific purpose" jury instruction warrant review under either the doctrine of plain error or ineffective assistance of counsel?*

2. *Does the prosecutor's conduct warrant plain error review?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2    On September 18, 2016, St. Marks stabbed his friend, Cordell Wilson (Wilson), in the chest multiple times with a large kitchen knife.  Wilson and St. Marks grew up together in Havre, and were childhood friends.  A few days before the incident, Wilson contacted St. Marks to tell him he would be in town for the weekend, and St. Marks and Wilson agreed to meet so Wilson could work on St. Marks' tattoos.

¶3    St. Marks spent the day of September 17 drinking and driving around with another friend, Dustin Welch (Welch).  Toward evening, Welch invited other friends, including a fifteen-year-old girl, J.G., to join them at a local fishing hole to continue drinking.  After meeting at the fishing hole, the group went to St. Marks' trailer to continue their party.  On more than one occasion during the party, St. Marks brought up gang affiliation and became very angry, arguing with others about whether they were "bloods" or "crips."  During these conversations, St. Marks repeatedly brought out a large kitchen knife, and at one point told J.G. he didn't care what he did that night, because he was moving to Great Falls in the

2

morning. After St. Marks displayed the knife the third time, J.G. became concerned and hid the knife under a stack of dishes in St. Marks' sink.

¶4 J.G. testified that, shortly thereafter, she "blacked out" due to the amount of alcohol she had consumed. Welch left the party to meet up with Wilson, and the two decided to go back to the trailer. Upon their return, they walked in on what they believed was St. Marks engaging in intercourse with J.G. J.G. provided a similar account, stating that when she "came to," Wilson and Welch were coming in the door, and St. Marks was separating from her as if they had just had sex. Wilson and Welch immediately left the trailer to give St. Marks and J.G. some time, and when they returned again, St. Marks and J.G. were sitting on different sides of the room. J.G. became visibly upset, and Welch took her to a back room to help her calm down. He then went outside to smoke.

¶5 At this point, the accounts of what happened between Wilson and St. Marks diverged. Wilson testified he told St. Marks he did not believe it was right that St. Marks had sex with J.G. He reminded St. Marks that St. Marks had a girlfriend, a son, and a house. Wilson said St. Marks then went quiet, and that there was a lot of tension between the two, so Wilson decided to leave. Wilson testified that St. Marks asked him to have one last shot of whiskey before he left, which Wilson agreed to do. Wilson tried to shake hands with St. Marks to make amends, but St. Marks refused. The shots were poured, and when Wilson lifted his arm up to drink the shot, St. Marks stabbed him in the chest with the kitchen knife. Upon realizing he had been stabbed, Wilson head butted St. Marks and began calling Welch for help. St. Marks then stabbed Wilson in the chest two more times.

3

¶6      Welch testified that, while he was out smoking, he could see into the trailer through a window.  He thought St. Marks and Wilson were goofing around and wrestling before he heard Wilson scream for help.  Upon entering the trailer, Welch saw Wilson holding his chest and saying St. Marks had stabbed him.  Welch told St. Marks to leave, ordered Wilson to lay down, and called 911.

¶7      J.G., who was still in the back room, testified that she heard yelling and believed there was fighting in the living room.  When she came out, she saw Wilson on the porch, bleeding, and Welch calling 911.  Welch yelled at her to leave, and she left the trailer.

¶8      St. Marks offered a completely different version of the incident.  He said after J.G. and Welch left, he and Wilson got into an argument about roofing.  Wilson told St. Marks "he didn't know shit" about roofing, and that St. Marks' grandfather, who had taught St. Marks how to roof, also "did not know shit."  St. Marks told Wilson to "watch his mouth," and that if Wilson "didn't stop slapping [his] gums, we will get down to business and squabble."  St. Marks testified at that point a fight broke out between the two men, and Wilson, who was much larger than St. Marks, was winning.  St. Marks said he told Wilson "I quit," and attempted to walk into the kitchen, at which time Wilson "smacked" St. Marks in the back of the head, causing St. Marks to "see stars."  St. Marks testified:

> I knew I would have to defend myself in a manner that I did not want to.  As I was looking down at the sink, trying to gain my composure.  I saw a knife blade.  I saw it as a barrier between us . . . .  [Wilson] continued to lunge at me.  I, out of instinct, reached up and popped him.  When he popped back, it did not even seem like it affected him. . . .  He just kept coming.  I thrust the knife a couple times.

4

St. Marks testified that the knife broke and he ran outside, told Welch what had happened, and then left.

¶9 EMTs arrived and Wilson was transported to the hospital. He had lost a significant amount of blood, his lung was collapsed, and his injuries required surgery. He was then transferred to the Intensive Care Unit, where he remained for several days before being released. After a few hours of looking for St. Marks, police found him walking down the side of a road, covered in blood, and with no injuries to his person. The State charged St. Marks with attempted deliberate homicide, or in the alternative, assault with a weapon.

¶10 At trial, Wilson, Welch, J.G., and St. Marks all testified to their version of the events that night. St. Marks maintained he stabbed Wilson in self-defense, and his counsel stated several times to the jury that the case was about self-defense. In addition to the testimony of Wilson, Welch, and J.G., the State called Detective Brian Cassidy, of the Havre Police Department, who had investigated the scene and interviewed St. Marks. During the initial interview, which was recorded and played for the jury, St. Marks told Detective Cassidy that he did not remember what happened, and Detective Cassidy testified St. Marks changed his story several times. Defense counsel later asked St. Marks about this interview:

> Q. Why is it that on the interview with Detective Cassidy, you have no memory what is going on you say repeatedly but here today you tell the jury what happened?
> A. Part was panic because of the actions I did. With the assault, I did not want [Wilson] in trouble. I was more afraid for him than myself. I wanted to take the blame so my friend could heal and not worry about being prosecuted by the law.

5

On cross examination of St. Marks, the State asked about this statement:

> Q. So did I understand from your testimony that you said at the time you were talking to Detective Cassidy, you were attempting to take the blame to keep [Wilson] from getting into trouble; is that your testimony?
> A. That's correct.
> Q. Okay. So during your interview with Detective Cassidy, how many times do you think you lied?
> A. I would say about a little over half of the interview.

The State then called Detective Cassidy to return to the stand, during which the following interaction took place:

> Q. Did you consider the possibility during the interview with the defendant that he was lying to cover for [Wilson]?
> A. No.
> Q. Why not?
> A. I believed he was lying to cover for himself.

Defense counsel did not object to this line of questioning.

¶11 In his closing statement, defense counsel maintained that St. Marks' use of force was justifiable, and further, that there were problems with the State's version of what had occurred. The prosecutor emphasized that Wilson's version was more consistent with the other witness testimony, and that St. Marks could not have stabbed someone multiple times without the intent to kill. Additionally, the prosecutor stated, "[Welch] got up and told the truth. He did not cover for the defendant or bolster. He just told you what he saw." St. Marks' counsel did not object to this comment.

¶12 After both parties rested, the District Court issued jury instructions, including Instruction #10 based upon § 45-2-201(2), MCA, regarding purposely or knowingly causing the result of death:

6

If purposely or knowingly causing death was not within the contemplation or purpose of the Defendant, either element can nevertheless be established if the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the Defendant's liability or the gravity of the offense.

St. Marks' counsel did not object to the instruction.

¶13 During deliberation, the jury sent a question to the court that requested clarification on Instruction #10. The Court asked the parties if they wanted to clarify the instruction, to which St. Marks' counsel replied "no, we can't." When the District Court asked St. Marks' counsel for a suggested answer to the jury, he replied, "[t]he answer is we can't clarify that. They'll just have to – we can't clarify it for them."

¶14 The jury convicted St. Marks of attempted deliberate homicide. St. Marks appeals.

**STANDARD OF REVIEW**

¶15 This Court generally does not address issues raised for the first time on appeal. However, when a defendant's fundamental rights are invoked, we may choose to invoke the common law plain error doctrine if failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Favel*, 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126 (citing *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79). Ineffective assistance of counsel (IAC) claims are mixed questions of law and fact which this Court reviews de novo. *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861 (citation omitted).

7

¶16 *1. Does the District Court's "specific purpose" jury instruction warrant review by this Court under either the doctrine of plain error or ineffective assistance of counsel?*

¶17 St. Marks argues that Instruction #10 resulted in plain error because it improperly instructed the jury regarding the elements of attempted deliberate homicide, noting that the element of "attempt" is defined as when "with the purpose to commit a specific offense, [a] person does any act toward the commission of the offense." Section 45-4-103(1), MCA. Section 45-5-102(1)(a), MCA, provides that "[a] person commits the offense of deliberate homicide if . . . the person purposely or knowingly causes the death of another human being." On this same basis, St. Marks also argues his trial counsel was ineffective for failing to object to the instruction. In response, the State does not defend the instruction, but argues the issue does not warrant exercise of plain error review because St. Marks has not made the threshold showing that failing to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. The State likewise argues that trial counsel's failure to object to the instruction did not prejudice St. Marks for purposes of his IAC claim, because it did not affect the outcome of the trial.

¶18 To properly preserve an issue for appeal, a defendant must make a timely objection. *Favel*, ¶ 17. However, unpreserved issues may be reviewed by this Court under the plain error doctrine. *Favel*, ¶ 23. Before this court will find plain error, the appealing party must: "(1) show that the claimed error implicates a fundamental right and (2) 'firmly

8

convince' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *State v. Daniels*, 2011 MT 278, ¶ 32, 362 Mont. 426, 265 P.3d 623 (internal quotations and citations omitted). This Court invokes the plain error doctrine "sparingly, on a case-by-case basis." *Daniels*, ¶ 32 (citing *State v. Lindberg*, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252).

¶19     We note, first, that the instruction appears to be inappropriate to the charge in this case.  As charged, to prove attempted deliberate homicide, the State was required to prove the Defendant took "any act toward" the commission of deliberate homicide, which is purposely or knowingly causing another's death.    Section 45-5-102(1)(a), MCA. Instruction #10, based upon § 45-2-201(2), MCA, which St. Marks labels a "specific purpose" instruction, is actually about the causation of an alternative result; that is, if purposely or knowingly causing a particular result is required by a charge, but that result was not intended by the defendant, the required element can nonetheless be established by proof of another, similar, result that the defendant did intend to cause.  Section 45-2-201(2)(b), MCA.  However, here, *causation* of a particular result was never contested. St. Marks conceded that he had purposely caused injuries to Wilson sufficient to cause his death.  The question here was whether he was justified in doing so in self-defense.  The jury alertly asked for clarification about Instruction #10, because it didn't apply to the charge.  Nor do we believe the instruction undermined the fundamental fairness of the proceeding, given the way the case was tried.

9

¶20 "A defendant who relies upon the defense of justifiable use of force concedes that he acted purposely or knowingly." *State v. Nick*, 2009 MT 174, ¶ 13, 350 Mont. 533, 208 P.3d 864 (citing *State v. Houle*, 1998 MT 235, ¶ 15, 291 Mont. 95, 966 P.2d 147; *State v. Sunday*, 187 Mont. 292, 306, 609 P.2d 1188, 1197 (1980); *People v. Joyner*, 278 N.E.2d 756, 760 (Ill. 1972)). In *State v. Ilk*, 2018 MT 186, 392 Mont. 201, 422 P.3d 1219, Ilk was charged with two counts of attempted deliberate homicide after he fired gunshots at his ex-girlfriend and her friend. *Ilk*, ¶¶ 4, 13. Ilk claimed he acted with justifiable use of force, because one of the victims had shot at him first. *Ilk*, ¶ 6. At trial, the prosecution presented evidence that Ilk was the only aggressor in the altercation. *Ilk*, ¶ 4. On appeal, Ilk argued his substantial rights had been affected, warranting reversal of his conviction, because the District Court erred by offering conduct-based instructions of knowingly and purposely, instead of the proper result-based instructions. *Ilk*, ¶¶ 10, 17. We disagreed, holding "the error in giving the conduct-based mental state instructions would have had, at best, a tangential effect on the jury's consideration," because, as we likewise held in *Nick*, Ilk had admitted to acting purposely and knowingly by relying on the defense of justifiable use of force. *Ilk*, ¶ 25.[1]

---

[1] *Ilk* was also premised upon our decisions in *State v. Rothacher*, 272 Mont. 303, 901 P.2d 82 (1995) and *State v. Patton*, 280 Mont. 278, 930 P.2d 635 (1996), in which we addressed erroneous conduct-based mental state instructions given in deliberate homicide trials, and concluded the errors had been harmless. We explained:

> . . . [T]his case is similar to *Rothacher* and *Patton*, because there was no evidence that Ilk, while intending his conduct of shooting, did not intend any harm to result from that conduct.

*Ilk*, ¶ 24.

¶21 We reach the same conclusion here. Although St. Marks seeks to distinguish *Nick* and *Ilk* by arguing that he also asserted alternative defenses to justifiable use of force, a review of the record reveals otherwise. St. Marks' trial efforts, including evidence and argument, were directed virtually entirely to his defense of justifiable use of force. In his opening statement, St. Marks' counsel stated, "[t]his is a case of self defense. . . . Ladies and Gentlemen, this is a case of self defense and we would ask you to return a verdict of not guilty." The defense called one witness, St. Marks, who testified only about his version of the incident, and explained that he had stabbed Wilson in self-defense. St. Marks offered no other theory for finding him not guilty of the charge. Further, while the prosecution mentioned the instructions, including Instruction #10, it did not make an argument for guilt based on its application, but contended St. Marks had intended to kill Wilson under application of the correct mental state instructions, stating in closing: "you have been given two definitions. One for purposely and one for knowingly. . . . In this case, the evidence in front of you allows you to infer that there was *noting* [sic] *accidental or incidental about his stabbing [Wilson]*." (Emphasis added.) Again, there was no conflict between the parties about the result caused by St. Marks, and the prosecution did not seek to prove that St. Marks had intended to cause any other result. Despite the incorrect instruction, the case was tried as a straight-forward determination of St. Marks' intentions in causing the injuries to Wilson, and the necessity of his use of force. As the prosecutor argued in closing:

> *I have to prove to you that the defendant performed an act toward the commission of the acts* [sic] *of deliberate homicide.* I would submit to you that the act of stabbing Cordell Wilson in the chest three times with a nine inch blade, satisfies that element. He did so with the purpose to commit the

11

offense of deliberate homicide. Again, what else are you planning if you are lunging a knife into someone's chest three times? Maybe the first time you can say it went in and he did not realize how deep it was going to go in. But the second time? The third time?

(Emphasis added.)

¶22 As in *Ilk* and *Nick*, St. Marks' reliance upon the defense of justifiable use of force conceded that he acted with purpose or knowledge, and the jury clearly rejected his assertion of self-defense. This does not mean that a justifiable use of force defense necessarily precludes in every case, an argument that the requisite intent was not present when the crime charged is an inchoate offense, such as attempt. Section 45-4-103(1), MCA, provides: "A person commits the offense of attempt when, *with the purpose to commit a specific offense*, the person does any act toward the commission of the offense." (Emphasis added.) Thus, an individual could concede that he acted purposely and knowingly, while still contending that his purpose was not to attempt the commission of a "specific offense," such as homicide. However, the record in this case, where the prosecution did not seek to prove that St. Marks had intended to cause any result other than Wilson's death, does not lend itself to such an interpretation. Given the trial record, we are not "firmly convinced" that failure to review the inapplicable instruction would result in a manifest miscarriage of justice, leave unsettled the question of fundamental fairness of the trial, or compromise the integrity of the judicial process. *Daniels*, ¶ 32.

¶23 We determine whether counsel was ineffective using the two-part test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), under which the defendant must prove "(1) that counsel's performance was

12

deficient, and (2) that counsel's deficient performance prejudiced the defense." *Whitlow,* ¶ 10 (citing *State v. Racz*, 2007 MT 244, ¶ 22, 339 Mont. 218, 168 P.3d 685). If the defendant cannot satisfy either one of these elements, his or her ineffective assistance claim will be denied. *Whitlow,* ¶ 11. Under the second prong, a defendant must "demonstrate prejudice by showing a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance." *State v. Walter*, 2018 MT 292, ¶ 14, 393 Mont. 390, 431 P.3d 22 (citations omitted).

¶24 We recognize the inquiries are not the same, but for reasons we have discussed above in concluding that the exercise of plain error review is not necessary to preserve the fundamental fairness of the trial proceeding, we likewise conclude that the claimed error by trial counsel in failing to object to Instruction #10 did not prejudice St. Marks by raising a reasonable probability that the trial result would have been different but for counsel's performance. The instruction did not derail what was a clearly directed trial about St. Marks' intentions and his assertion that his actions were justified by self-defense.

¶25 *Does the prosecutor's conduct warrant plain error review?*

¶26 St. Marks also argues the prosecutor's conduct of commenting on St. Marks' credibility in closing, and of asking Detective Cassidy about his perception of St. Marks' intention during his interview, warrant plain error review by this Court. The State responds that the prosecutor's actions were not improper, and, in any event, they do not warrant plain error review.

13

¶27 St. Marks relies upon *State v. Hayden*, 2008 MT 274, 345 Mont. 252, 190 P.3d 1091, in which we concluded plain error review of a prosecutor's misconduct was necessary. *Hayden*, ¶ 30. There, the prosecutor had extensively questioned a detective about the credibility of other witnesses, including asking him to opine on whether he thought the witnesses' earlier or in-court statements were more "believable." *Hayden*, ¶ 12. Additionally, the prosecutor argued in his closing argument that the witnesses were "believable" and that the jury could "rely on" their testimony. *Hayden*, ¶ 14.

¶28 The actions of the prosecutor in *Hayden* were far more egregious than the claimed errors by the prosecutor in this case, and we conclude that the prosecutor's actions here do not justify plain error review. Unlike *Hayden*, the prosecutor's questioning of Detective Cassidy and her comments in closing were very limited in scope and, in the case of the questioning of Detective Cassidy, were made in response to St. Marks' testimony that he had been lying during his statement to Cassidy. Likewise, the prosecutor's statement in closing that Welch had "told the truth" was, however inappropriate, a passing comment that did not rise to the significant errors made by the prosecutor in *Hayden*. Finally, we conclude St. Marks' conviction is not reversible upon cumulative error.

¶29 Affirmed.

/S/ JIM RICE

We concur:
/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER